And Mr. Perez, we will hear from you, representing Mr. Delgado. Thank you, Your Honor. May it please the Court. This is a case, Your Honor, where the sentencing that actually occurred in court was based more on a fiction than the reality of the case. There was a 30-level enhancement that was done on Mr. Delgado, where he was accused of laundering $600 million, which on its face probably is one of the largest laundering cases that this country has seen, where somebody's actually being held responsible for $600 million. And as this Court stated in the previous case, that sentencing should not be based on fiction but should be based on reality. The reality of this case is that Mr. Delgado actually was involved with $1 million and then $50,000 a year later in Chicago, but he was never involved with $600 million. He was never involved with any other supposedly laundered funds other than the two instances in September of 2007 and in August of 2008. The facts and the timelines in this case are incredibly important. The facts are going to show, and this is from the star witness of the government, Mr. Pimentel, that beginning in June of 2006, they started a process of wanting to get involved with money laundering. They actually started reaching out and trying to entice people to use them as launderers. In August of 2006, there's an email which the government has really seized upon and uses to say that there was actually going to be $600 million involved with this case. That's very important because that's in August of 2006, and nothing happens until September of 2007. The government's own witness testified repeatedly that what was happening was, as he put it, an interviewing process where they were trying to get the people with the cartel to buy into what they were offering. And so they would do these elaborate things. They would meet with different people from the cartel, and as he put it, the cartel would always send somebody different, was always asking something more, was always asking to see if they could – just trying to feel each other out. And I submit to you that what is happening here is that we have, as Mr. Pimentel says, an interviewing process. The cartel is wanting to see if these people are actually capable of doing something and throwing figures out there to see if they'll run away, see if they're actually what they say they are. And the reality in this case clearly shows that Delgado and Pimentel were not capable of doing what they were saying they could do. What did the district court say about all of this? The district court in its sentencing doesn't really say a whole lot other than say that the intent is sufficient to hit Mr. Delgado and that he intended to move $600. Therefore, I'm going to hold him responsible. And what do you say about that? We believe that we – the law should be that he should be reasonably – What is the law, though? The law talks about intent, but however, when they're saying that intent is sufficient, there usually is money that's already there, and they're going to move that money and intending to move that money. This case is different because we're talking about the discussions leading up to actually having actual money there. So they're different. The law also talks about being reasonably capable of accomplishing the act. In this case, the evidence does not show that Mr. Delgado and Mr. Pimentel were reasonably capable of laundering the sum of money. In fact, the way that they went about this shows how amateurish and how, and I would say they were actually the clowns they actually were. To think that they're going to launder money, and it's going to be a sophisticated operation, and you're going to drive a million dollars in a car, and you're going to have a Hispanic do it, and then you're going to have a license plate from Mexico. That's just begging to get pulled over. To me, that shows that these people were absolutely not capable of doing the laundering which they were saying the government says that they were capable of doing. It just doesn't make any sense, if you're going to launder money, to be so foolish, yet Mr. Delgado is being held out as this big launderer who is going to move $600 million. And I don't believe that the evidence in any way – I think it's clear air to hold him responsible for those kinds of figures when this whole process goes for over a year, nothing happens. As Mr. Pimentel clearly points out, they reached out and nothing happened, and he over and over and over says there were large amounts of money discussed, and he puts – and he says, Marco sold ourselves as this big-time money laundering company, which we were not. He clearly said that. He talks about the 300 and the 600, the big figures that are being thrown about. And as he puts out, it's been almost a year since he started these meetings, and nothing actually happened. He even says that he was getting nervous about meeting these people because they were going to have to meet them at some point. Now, to do money laundering, you've got to have some sort of system in place to clean up that money. Now, what sort of system did he have in place that would have cleaned up, I mean, $100 million? It's been alleged that he had set up shell corporations and he had talked to people in the Turks and the Caicos and had talked about doing something involving gambling. None of those apparatus were ever used. When the time came to move – Were they available for his use? It's unclear if they were available for his use or not, John. What about his law firm? How much could he have run through there? I guess you could say potentially he could have run incredible amounts through the firm, but no money was actually ever run through there until we get to Chicago in August of 2008 where he deposits $45,000 into his trust account. However, even in those circumstances, they originally tried to deposit the money in his girlfriend's account. They're turned away because it's – Pimentel shows up and says, I'm going to deposit it into this trust account, and it's not the trust account, it's the girlfriend's account. But what would they have done with it after that? I mean, you can't just deposit it in one account and leave it there, can you? I mean, the money laundering scheme would require investment in some other kind of at least facially legitimate business, or am I wrong about that? If they were actually a legitimate laundering operation, I would say that's what they would have done. But the facts belie what was actually happening here, where they're trying to drive the money across in a car with Mexican plates, and then in Chicago, the person who's giving them the money throws it into the street and drives away. And then he tries to deposit it in his girlfriend's account, isn't able to do so, and then the government follows the money, and then he tries to put it into his trust account. But there's no doubt on the record before us, it seems to me, that if he had had an opportunity to launder $600 million, he would have sure tried to do it. Well, I think, Your Honor, that's more of a hope than an actual intent. Well, I mean, I'm not saying that you may be right about that, but he sure would have done it if he could have. That very well may be, Your Honor. So that's the intent aspect of that. But maybe that's all there is, and the authority, at least some authority, indicates that it may be enough. And I'd submit to you that the authority is wrong because they haven't been faced with the facts of a case like this. What is the best authority that you've got in which a defendant shows clear intent to launder large sums of money or steal large sums of money, whatever the sentence and underlying crime is, but it's unrealistic? I think it's the case law where they're talking about that he reasonably would be capable of accomplishing what he sets forth to accomplish. And I think in this case he is not. But is there a case that would help us understand how that's to be applied to facts? I had a U.S. v. Johnson and also the case that the government cites, too, talks about the reasonable capacity to accomplish what you're setting forth to do. And I would submit that that's what this court should do. However, Your Honor, there's also levels that were hit in this case for- Let me ask you something about the PSR and the court adopting the PSR. And I know you've been citing, too, and you've been referencing the trial record as far as things. How should we reconcile the difference of the court adopting the pre-sentence report and making those its findings vis-à-vis what was heard in trial? And I would submit to you that it's one of the things that as a defense attorney it always gives me problems when I'm in trial. The probation officer prepares a pre-sentence report based largely on reports that they get that they don't know, they haven't sat in the trial. They just get those reports, they summarize them, and they submit them to the court and they say this is what we should go on. In this case, the trial court heard the testimony. The testimony should be what controls in this case, not the hearsay that a probation officer who is not familiar with the case puts into a report. Submits, and then as happens in this case, the district court merely adopts. It becomes more of a formality than what it should be. And I mean once it adopts, though, it becomes a finding of fact and that sort of pigeon-hoses type of discretion we have in reviewing it, right? Well, this court can still review for clear error, and under those circumstances I believe that is clear error, to completely disregard the testimony that happens in trial and rely on the hearsay that a probation officer who hasn't been there, isn't familiar with the case, submits to the court and asks the court to adopt. In this case, Your Honors, there is also the sixth level bump for somebody that's engaged in the business of laundering. When you go through the different criteria, it's pretty clear that Delgado is not in the business of laundering. He wanted to get into the business of laundering, took steps to get there, over a year was in this interview process, and then finally gets hired. I submit to you that the criteria are not present for the sixth level bump for somebody who is in the business of money laundering on a regular basis. He wanted to be, but he never got there. But isn't that like someone said trying to get into the used car business, and he has three used cars and he's trying to sell them, trying to sell them to everybody, but nobody will buy them. I mean, isn't he in the business of selling used cars even though he's unsuccessful? I would submit to you that somebody who is living the pipe dream, I could go out and say that I'm a multimillion dollar corporate lawyer and hold myself out to the world. That's what I am. But if I don't actually do that, then I'm not in that business. No, no, no. I'm talking about the hypothetical, I guess it is, that I'm suggesting. He's got the cars to sell. He just hasn't got the clients. I mean, here, your man, he has got the goods. He says he's got the goods to sell. He's just not selling. And I'd submit to you by your analogy, Your Honor, this used car salesman would be trying to sell those cars out of his house. He wouldn't have the marketing necessary to be holding himself out in the business, yet he's a used car salesman. Okay. And the facts of this case, Your Honor, the way that everything went about just shows that this man is not in the business of laundering money. He was also hit for four levels for role in the defense, and there was two levels for abuse of a position of trust. And I submit to you that the court did not take the proper steps in determining whether there's an abuse of a position of trust because it's a two-step process. First, you have to find the position of trust, and then you have to have the second step. The judge may make some finding that that position of trust significantly contributed to the commission of the offense. Had Mr. Delgado used a fiduciary duty or a fiduciary position to fool people, he would be abusing a position of trust. In this case, we don't have that. Mr. Delgado did not have a fiduciary relationship with the people from the cartel, and it is impossible for it to have been significantly a contributor to the offense, and it shouldn't be applied at all. Now, back to the $600 million. Under the circumstances here where he was hoping to get $600 million, and he only had apparently involved himself with $1,000,000 or $1,045,000, but he was trying to develop his business to surely increase it far beyond that, had every intention to increase it beyond that. Do you have any suggestion to us what amount would be a proper amount to base the sentence upon? In this case, I would submit to you that it is the actual amount that was used. That when we talk about what may have happened, well, he may have been hit for $100 million. Where does it stop? Well, what you're saying is it's all or nothing. In other words, he either hit $600 million or nothing, in effect. So $600 million on no basis to sentence him. He absolutely should get hit for the money that he had, which I think is a 16-level bump upwards, which is significant. Now, one of the things that also is important in this case, Your Honor, is the government acts as though this case is such a big case. They waited until the day of limitations to induct. Had it really been a $600 million laundering conspiracy scheme, I submit to you that the government's actions in this case would have been different as well. Those actions belie what's actually happening here. Delgado was a wannabe, and he's being punished as though he's probably one of the biggest launderers in the history of this country, and that's just not right, Your Honor. Okay, Mr. Perez. Should I have your argument? Mr. Gay? Good morning. May it please the Court? Well, I'd like to begin talking about the more than $400 million bump, as it's called. In this case, I think that it's absolutely supported by the record, and it begins with the fact that although there's arguments here that Mr. Delgado is not in the business of laundering money, he convinced a sophisticated drug cartel out of Mexico to give him $1 million in cash as the trial run amount. Which is less than 1% of what they were talking about running through him. You're talking about over half a billion dollars. That's a lot of dollars. And there is substantial testimony in the record to support those numbers. In fact, if you look—and what's interesting in this case is this is a case where the pre-sentence report largely tracks the evidence of trial. This is not where it's made up of a lot of extraneous information that comes from reports. The narrative that's in the pre-sentence report is a narrative that comes from— But the narrative for what? The narrative for the enhancements, Your Honor, the offense conduct, how it is— But where is the narrative that supports $400 million or $600 million? Well, I knew this was going to be a hotly contested issue, and so I have the testimony here. And so all the little green tabs here reference Girl Scout cookies primarily where the emails talk about it. So Mr. Pimentel, who is the person who has actually stopped carrying the million dollars, goes into a lengthy discussion about how they're using code in these emails, how— But they use code in all drug transactions. Exactly. So the idea that there's Girl Scout cookies and that they're making donations, he dispenses with that quite clearly and says there's no contractors, there's no buildings, there's no Girl Scout cookies. There's none of those things. What we have here is basically a series of code words, and he explains exactly what is meant in these emails and how it is explained to them. What's also interesting is that he characterizes it as like puffing, that he's trying to get business. Well, the fact is that he has established offshore bank accounts, limited liability corporations. He uses aliases. He says he has those things. I think with Judge Jolly actually, the counsel for the defendant, we're trying to figure out how can you launder a half a billion dollars without having some evidence of him being capable of actually laundering a half a billion dollars. And I suppose if the test was that we only prosecuted people who were successful, then that would be one thing. But in this case, it's true. He was thwarted before we ever found out. Yeah, but what he's doing—I mean, you're stacking it on me as if he had done all that harm. He didn't do the harm. And you're saying that the man that does the harm gets the same sentence as the man who's ineffectual and doesn't cause any harm. That doesn't sound very rational to me. The guidelines are very clear, and the district court clearly stated that it's the amount that's intended. It is, and it really is. But attached to the intended, though, is reasonably capable of doing it. And so when we look at Mr. Keenan's testimony, that the cartels were willing to give him over a million dollars just to—as a trial run, and then he ultimately ended up trying to do $100,000 more after being caught the first time. He clearly is someone who has their ear, and he literally— I mean, it's like Judge Reeves said. I mean, you start arguing for $600 million by saying, well, they're willing to give him $1 million, which is less than one-tenth of 1% of the—I mean, that's not very convincing to me at this moment. Well, I guess when I look at it, I think that anybody who entrusts $1 million in cash to someone has a reasonable belief that that person can do— If you have $1 million and that's all you have, I agree with you. But if you've got $600 million, you're not going to miss $1 million. I mean, that's the way I would look at it. But I don't have $600 million. Maybe if you had $600 million, you wouldn't— Well, I believe that this is not a case where you are looking at a lot of uncorroborated pre-sentence report narratives, where we have direct evidence in a lengthy trial that the district court— Direct of his dreams. Well, actually of the correspondences, the phone calls that were recorded, and his dealings with others that were testified to. So we have direct evidence— I can get it done for you. I can get it done. I may not have the ability to get it done. I'm going to convince you, though, that I can get it done. It reminds me of the law of an attempt. An attempt is an act that tends but fails to effectuate the commission of the offense. Well, he attempted to launder this sum of money. He wanted to launder it, and I think Judge Schleyer was bringing that up, that if he had— If they had given him $600 million, he would have gone with that— Or he would have died trying. But he couldn't launder $600 million. I admit that I'm not going to try to sit here and say that this was a good plan. I don't think that any of the—this morning has been sort of a narrative of criminals making bad decisions and maybe not having thought things through. In this case— Most of them don't. That's why they're caught. I must admit, when you look at it, it seems that the mechanics that were in place were poorly thought out on some level. I think that, you know, he got caught. That's one way that you kind of have a clue that it wasn't really probably a really good plan. And so—but that's not— But this man, actually, under the guidelines, could he have been sentenced to life imprisonment? Yes. He was capped, though, and that's really at the end of all of this. And so the government takes this man, I mean, who is a failure, and you're going to send him to prison for life because he's a failure. I mean, it just doesn't register with me. He was charged multiple counts, and so he was capped at the statutory maximum, which is 240 months, which, by the way, if you were to subtract out a lot of—in the end, I believe that if you—upon reviewing the testimony in this case and you look at the evidence and the district court's findings, that the amount that was used to calculate the base offense level was not clearly erroneous. Secondly— Well, the other thing is if—I mean, this is somewhat a friendly question to you, but if it's not $600 million, what is it? Because it's either $600 million or $1 million, and it's clear there should be some way maybe more than $1 million and considerably less than $600 million. Where do you peg it? I don't know. And we see this in loss calculations, in health care fraud, where defendants want to argue that, oh, no, in this mortgage fraud scheme, the bank didn't lose any money, but the law says, no, you intended to defraud that bank. But the district court has an obligation to make those specific findings on the amount that was actually lost in the mortgage fraud case and all that, right? In this case, the district court does make that specific finding as to the amount that he was reasonably capable of losing. He really—the judge said— The district court really believed that this guy could launder half a billion dollars, because that's how I term the phrase. That's a lot of money to me. I agree that it's a lot of money, but the fact is that—and I know that we've debated about whether the million is significant or not in cash. This is not a case where you have an organization that doesn't even have the goods that could be laundered. Here there's no dispute. I don't think there's any dispute that we're dealing with a large-scale drug trafficking organization that has hundreds of millions of dollars to launder. He's dealing with the former wife of the president of Mexico in making these arrangements. He has high-level contacts. The idea that he's some sort of novice, the record belies all of that. He is very sophisticated. It's not—you do not get to a table in Mexico City with the former wife of the president of Mexico and other high players negotiating how you're going to launder funds. I don't know about that. Con artists can get in doors that you wouldn't dream they can get in. Should he be prosecuted for who he knows then? I'm just talking about the reasonable—because the court says reasonable capability of being able to do it. Aren't we going to need—aren't those real factual issues to determine whether he is reasonable capable? The Wells Fargo thing up in Chicago, they couldn't deposit the money there because there was no Wells Fargo in Chicago, I think. Had to drive to Wisconsin. Right, had to go to Wisconsin. Then they were not able to do it once they got back to Chicago. Then there was these other missteps, and driving a million dollars in cash across the interstates, southern United States on 20 or I-10 or whichever way you went, shows a lack of sophistication at least. But in the end, though, coming back to the legal standards, and as you correctly point out, these are all factual questions. Why don't we—what would happen if we sent it back and we say to the judge, you need to take another look at this and try to determine, given his apparatus, how much money was this man able to launder? Could he—what would be the result of such an— I would disagree that that is the legal standard, however. It's not whether—it's whether he intended to launder more than $400 million. Yeah, but take that into account, and whenever you take that into account, then, I mean, you go— So had he just convinced him to give him the $400 million or more, $600 million, had he just convinced him to give him that money, he would have, at that moment, been responsible for the entire amount, regardless of whether he drove it across the country, whether he had sophisticated systems in place. I understand that, but if he could not demonstrate to the people that had that kind of money that he was capable of successfully laundering, they would not have given it to him. And that— And his intent just becomes nothing but a dream. And that's where I believe that, in this case, because we had a jury trial, you actually have a record where we have the witness testimony that sets forth all of the procedures and things that were done to set up an operation and to convince a cartel in Mexico to provide him with a million dollars with the promise of a lot more. In fact, when he's not talking to those members at the table in Mexico City and he's talking to Mr. Pimentel, his right-hand man, he's actually excited. He says, there's going to be a lot more. He knows that he's on to something. If he can just pull this off, he's going to hit a home run. He does it. And there's no guarantee the cartel—I guess according to some of the evidence in the PSI report, the cartel was sort of interviewing people, right? I mean, there were multiple people who they were purportedly interviewing. In the beginning, his fee was too high. That's why we talk about the year of negotiations. He wanted too much. He was trying to extract too big a fee, and they were getting it done cheaper. And so in the end, I wasn't really ever clear what he was able to reduce it by, but there's definitely email conversations where it shows that once you successfully do this, you can go back to them and get your rate up. Didn't the cartel write him off at some point, lose confidence in him? He owed them $2 million. Did I read that in this record? Ultimately, having lost the million-dollar load, that's when things really started deteriorating. And yes, there's no doubt that at some point they realized that they had gotten in with the wrong guy. And then he's taking steps, trying to get various people involved to honor the debt, to put up collateral, so he could go back and get them to maybe give him another shot. And so ultimately, one of the downsides to even a million dollars is that if you lose it, you have perhaps some difficult choices to make, apparently, about how you're going to deal with the people who own the money. And so yes, Your Honor. So what you're saying, it seems to me you're conceding that there was no reasonable probability, once the million dollars had been lost by him, that he would ever launder money from this group again. Actually, they gave him – there were negotiations for another $100,000, and then he lost the 45 – well, he got the 45 deposited into his IOLTA account, but ultimately at that point, it was already sort of under surveillance. And actually he was able to convince them to give him another go, which is somewhat surprising in some ways, that after having lost the million. But I want to go back to the sentencing transcript for a moment. And there's a long objection here by trial counsel, and he's talking about the – it's got to be by preponderance of the evidence, and they're talking about the various enhancements. And the jury did not believe, obviously, Mr. Delgado, but I don't believe that his testimony rose the level of committing perjury. In addition, he's talking about the various enhancements for being in the business. And then finally, the district court says, well, let me tell you, in most cases, the PSR is taken from law enforcement reports. Here, his testimony came out during trial counsel, especially on relevant conduct. It was testified to here. The judge made the factual findings regarding the relevant conduct, and the relevant conduct in this case is the amount of funds to be laundered. And that is the factual determination that the district court is vested to make and that I don't believe under a clearly erroneous standard that this court can substitute its judgment for the judgment of the district court under the legal standards. I understand the court's concerns that it's a very large number. However, I would also point out that because of the operation of the statutory cap, that he ended up at $240,000, which actually would cross-reference to a much lower number of amount laundered. In other words, the fact that it was more than $400 million got truncated somewhere in that guideline range, which effectively puts him somewhere between $1 million and more than $400 million, as Judge Jolly sort of suggested. Is there not a middle ground in here? In effect, the middle ground was achieved, to be quite honest in looking at this. The defendant also raises the issue with respect to whether he was in the business of money laundering. Absolutely. If the court finds that he's not in the business of money laundering, then what does that do with the first count with respect to the 30-level increase? Are they tied? Are they wedded together? He would still not get below $240,000 even with taking off those six levels for operating the business. His guideline range would still put him at a 38. No, I guess my question – I'm sorry. My question is if we find he's not in the business of money laundering, could we still find that he was capable of laundering $400 million? Absolutely. I don't think that the two guidelines are hand-in-hand. One is the amount under negotiation that's reasonably capable of being laundered. And by that, I think what they're getting at is – I didn't even see any negotiations. Well, there were ample – that's what was going on for an entire year, of course, was extensive negotiations. Negotiations about what? I didn't – I mean I didn't interpret – well, they didn't get into it in great detail, but I didn't – what I saw I did not interpret as negotiations. And meetings and discussions, and he was being vetted, no doubt. But I do believe on the subject of whether he was in the business, and you look at it. So there's testimony in trial about the offshore accounts, the use of LLCs. There's something that's discussed about – Offshore accounts where he said that he could do it. They went to – They went there and said that he could do it. And they used aliases at various times. He's using his IULTA account at various times. There's something – there's discussion about a mirror operation where money is deposited in one country and money is deposited in another country. And with that, it never actually moves, but somehow – and it's not completely explained in my mind how that operates. But they talk about it as a mechanism that they could possibly use. But again, that's mere talk, is it not? Is that mere puffery? Is that I'm saying that I could get it. I'll take you to – I think one of them was gambling. He says that he has contacts in casinos that he can use. That's another way. Will we ever know if he actually did have those contacts? He never got a chance to put the money there, so we don't know. But at some point, I think that a defendant should be held responsible for his own representations. This is not where some agent or some confidential informant is putting it on him. These are things that he specifically said, and some of these conversations are recorded. He forwarded his emails. I think we have over 30 exhibits in this job of emails to Mr. Pimentel, which were then turned over to the government, in which you can just see this process taking place. And so unlike the reverse sting where the government set the amount of drugs and the number of guns or all that kind of stuff, this is a case where he's the one who's setting up this operation. He is the one who's trying to court them to hand over as much money as possible. I see that I'm out of time. Thank you. Thank you, Mr. Gay. Mr. Perez. Thank you, Your Honor. The testimony at trial is very important. Pimentel's testimony is incredibly important. Pimentel, and I'm begging you, I'm going to read a little bit. Pimentel is still here talking, and he's saying, because we have all these big plans and big meetings and big numbers were thrown at us. You're going to do this. You're going to do that. You're going to move this money, and you're all going to be rich and powerful. That's a quote from Pimentel. And he goes on and says, we were getting all these big numbers thrown at us. As you recall, he exhibits $300 million, $600 million, and the promises of us being rich and powerful. This is Pimentel. And he says, but it's already been almost a year since we've started doing these meetings, and nothing actually happened. Pimentel is very clearly saying, and he said this was going to be his dry run. If they were successful, and that's the big one, if they were successful, they were going to get other money thrown in their direction. They were clearly not successful. The way that they acted, they were not going to be successful. The court, I think, hit it right on the nose when it talked about con artists, and that's what I think they'll gather on. There's testimony that the government got into involving a meeting. It had nothing to do with a laundromat, but it has everything to do with what kind of a con artist Pimentel and Delgado are. They go to a mediation. Pimentel poses as an expert in investments, and Delgado was doing this with his law partners when they were involved with litigation. He presents this gentleman as an expert, and Pimentel goes with it. These guys, and I submit to you, you hit it on the – nail on the head when you talk about a con artist. They're trying to con people. They're trying to con the cartel, and the cartel wasn't going for it. That's why this stuff went on for a year before anything even happened. The government relies very, very strongly, and they push it, and they push it in their brief, and they pushed it at sentencing about the Girl Scout cookies. That happens in August of 2006, very closely at the inception of when this interview process starts. They're throwing numbers out there, as Pimentel says. They're throwing numbers at us, and I submit to you the cartel is trying to see if these people – are they going to flinch? They're looking for a reaction. It wasn't based in reality. The reality wasn't going to happen until further down the line, which is why reality is what's important in this case. And I submit to you that we're going to get some bumps, but that the sentencing in this case should actually be closer to like a level 32, which we're talking about a ten-year sentence, which is significant. But to go all the way to the statutory max, or if they could have, to go all the way to life, just isn't based in reality. That's clear error. I think that the sentencing in these kinds of cases should be fair, and I think to be fair in this case that we have to look at what was reasonably capable of being accomplished. The government says that if we find that he's in the – if we don't find that he's in the business of monda laundering, we can still find that he's capable of laundering $400 million. Is that – I mean, do you disagree with the government? Those are two separate enhancements that this defendant faced. And I would disagree to the extent, I guess, if they actually gave him the $600 million like they said, well, sure, he'd be responsible for it. But reality is, are they going to do that? The reality is they're going to have dry runs. The reality is they're going to see if he's capable of doing it, and the reality in this case is that when he was given the opportunity, he failed miserably. And that's why I believe that reality is what we should base the sentencing in this case on. And the reality is that he should not get sentenced to what he got sentenced, and I think that there is clear error, and the district court should make a determination as to what could have really been accomplished, what was reality – what was he capable of. Okay, Mr. Price. Thank you very much. Before we take up the next cases of the day, we will take about a ten-minute recess. Thank you.